UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ANTOINE JONES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:16-cv-01272-JMS-MPB |
| | ) |
| VULULLEH Officer, | ) |
| | ) |
| Defendant. | ) |

**Order Granting Motions for Extension of Time to File a Surreply
and Denying Motion for Summary Judgment**

Plaintiff Antoine Jones brought this civil rights action pursuant to 42 U.S.C. § 1983. He alleges that Officer Vululleh failed to intervene to protect him during an altercation with another offender at the Correctional Industrial Facility, in violation of his Eighth Amendment rights. Presently pending before the Court is Officer Vululleh's motion for summary judgment. Mr. Jones's two motions asking for an extension of time to file a surreply, dkts. [76] and [77], are **granted**. For the reasons explained below, Officer Vululleh's motion for summary judgment, dkt. [61], is **denied**.

### I. Summary Judgment Legal Standard

Summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court views the record in

the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## II. Background

The following statement of facts was evaluated pursuant to the standard set forth above. That is, this statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Mr. Jones as the non-moving party with respect to the motion for summary judgment. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

On February 20, 2016, Mr. Jones was an offender incarcerated at the Pendleton Correctional Industrial Facility. *See* dkt. 62-2 at 9 (Jones Depo. at 13:1-15). Officer Vululleh was working as a Correctional Officer on that day. Dkt. 62-1 at ¶ 1. For some period of time until February 20, 2016, Mr. Jones shared a cell (cell 8B-2D) with Ricky Outlaw. Dkt. 62-2 at 14, 20-21 (Jones Depo. at 20:5-12, 26:11-27:4). The cell they shared was fairly small, shut by a solid door with two windows, no cuff port, and a gap to the ground almost 2" in height. Dkt. 62-2 at 15-18 (Jones Depo. at 21:12-24:8); dkt. 62-3 at 2; dkt. 73-1; dkt. 73-2 at 2 (photo of door with ruler in the gap). Although Outlaw had a history of argumentative and violent behavior (*see* dkt. 62-2 at 22-24 (Jones Depo. at 28:7-30:16)), Mr. Jones was not concerned about Outlaw. Dkt. 62-

2 at 25 (Jones Depo. at 31:5-16). He had never expressed any concerns to anyone, including Indiana Department of Corrections employees, that he had any concerns about Outlaw prior to February 20. Dkt. 62-2 at 50-51 (Jones Depo. at 61:24-62:7). Nor did Mr. Jones request protective custody as to Outlaw. Dkt. 62-2 at 56 (Jones Depo. at 67:4-22). Until February 20, they had never had a verbal argument or a physical fight. Dkt. 62-2 at 25 (Jones Depo. at 31:17-22). On this date, Outlaw was approximately 5'7" tall and weighed between 160-165 pounds, while Mr. Jones was almost 6'5" tall and weighed about 278 pounds. Dkt. 62-2 at 26 (Jones Depo. at 32:1-12).

Some time on the evening of February 20, 2016, Outlaw had just microwaved a cup of hot coffee when Mr. Jones and Outlaw went back to their cell because Outlaw allegedly wanted to talk to him. Dkt. 62-2 at 27 (Jones Depo. at 33:12-24), dkt. 73-4 at 17 (Jones Depo. at 52:20-24). Mr. Jones closed the door behind him when they entered the cell. Dkt. 62-2 at 28 (Jones Depo. at 34:2). At that point, Outlaw began to pick a fight with Mr. Jones, and Outlaw and Mr. Jones entered into a loud verbal argument. Dkt. 62-2 at 28-29 (Jones Depo. at 34:3-35:5).

At around 11:13pm, Officer Vululleh was conducting a security check of the area. Dkt. 62-1 at ¶ 2. A video camera captured Officer Vululleh outside of Mr. Jones and Outlaw's room at 11:13:12pm. Dkt. 70-1 at 3. Officer Vululleh states that he could see that Mr. Jones and Outlaw were involved in a verbal argument. Dkt. 62-1 at ¶ 3.

Mr. Jones was facing the door with Outlaw blocking his way to the door and could see Officer Vululleh through the window. Dkt. 62-2 at 35, 37-38 (Jones Depo. at 41:11-23, 43:23-44:1). Mr. Jones then told Outlaw, "Police at the door." Dkt. 62-2 at 29 (Jones Depo. at 35:6-7). Outlaw looked back at Officer Vululleh – Mr. Jones characterizes the expression on Officer Vululleh's face as a "smirk" with an "it's okay" look." Dkt. 62-2 at 29, 47-49 (Jones Depo. at 35:8-20, 58:23-59:2). Outlaw then turned back and threw his cup of hot coffee at Mr. Jones. Dkt.

3

62-1 at ¶ 4; dkt. 62-2 at 29, 48 (Jones Depo. at 35:8-20, 59:12-19). Mr. Jones screamed to Officer Vululleh to come into the cell – Officer Vululleh did not and took no action. Dkt. 62-2 at 29, 36-37 (Jones Depo. at 35-21:23, 42:25-43:3). Outlaw produced a knife or mirror shard from some unknown place (dkt. 62-2 at 37 (Jones Depo. at 43:12-20)) and began stabbing Mr. Jones in the face and neck, causing severe blood loss and lacerations. Dkt. 62-2 at 29-30, 38 (Jones Depo. at 35:23-36:17, 44:1-3, 44:15-20), dkt. 73:4 at 13 (Jones Depo. at 48:2-17), 68-1 at 7 (image of scarred face), 75-1 at 19 (image of scarred face). Mr. Jones continued to yell out to Officer Vululleh to open the door, stating "[Outlaw] got a knife." Dkt. 62-2 at 37, 49 (Jones Depo. at 43:21-23, 60:8-9), dkt. 73-4 at 12 (Jones Depo. at 47:12-13); dkt. 62-3 at 2. Mr. Jones attempted to defend himself by punching at Outlaw. Dkt. 62-1 at ¶ 5; dkt. 62-2 at 37-38 (Jones Depo. at 43:2-20, 44:1-3). Officer Vululleh continued to take no action. Dkt. 62-2 at 30, 37-38 (Jones Depo. at 36:9-10, 43:21-44:1), dkt. 73-4 at 12 (Jones Depo. at 47:24-25). At some point, Mr. Jones was finally able to overpower Outlaw and held him down on the ground. Dkt. 62-1 at ¶ 6; dkt. 62-2 at 30, 38 (Jones Depo. at 36:9-10, 44:1-3). During the fight up to this point, Officer Vululleh held the door closed and did not call for backup or order them to stop fighting. Dkt. 68-1 at 9 (¶¶ 13-14), 11 (¶¶ 14-15). At some point soon after Mr. Jones was able to get Outlaw to the ground, Officer Vululleh called a "signal 10-10"[1] over his radio and ordered Mr. Jones and Outlaw to stop fighting (dkt. 62-1 at ¶ 7), yelling "Get off of him. Get off of him. Stop fighting." Dkt. 62-2 at 30, 38 (Jones Depo. at 36:13-15, 44:4-7). Mr. Jones and Outlaw complied and stopped fighting. Dkt. 62-1 at ¶ 12.

There is some dispute as to the timing of when and why Officer Vululleh called for backup. Officer Vululleh appears to allege that he called for backup contemporaneously with ordering Mr.

---

[1] A "signal 10-10" is typically used to signal an inmate fight. Dkt. 62-1 at ¶ 8.

Jones and Outlaw to stop fighting. Dkt. 62-1 at ¶ 7; *see also* dkt. 7-1 at 2 ("I ordered them to stop fighting and called a 10-10."). Mr. Jones alleges that Officer Vululleh did not call for backup until well after the fight had ended and not until Mr. Jones ran to the door and begged Officer Vululleh to call for backup. Dkt. 62-2 at 30-31, 49 (Jones Depo. at 36:23-25, 37:13-14, 60:10-61:1). Two witnesses, James Lynn and Claude Arender, assert that it was not until about 30-45 seconds after the fight ended that Officer Vululleh got on the radio to ask for assistance. Dkt. 68-1 at 9 (¶ 16), 11 (¶ 17). Backup arrived at 11:14:40pm (dkt. 70-1 at 3), or what felt like seconds to Mr. Jones. Dkt. 62-2 at 64 (Jones Depo. at 37:1), dkt. 73-4 at 16 (Jones Depo. at 51:17-20). Outlaw did not suffer any injuries from this fight. Dkt. 73-4 at 17 (Jones Depo. at 52:7-10).

Officer Vululleh did not enter the cell until backup arrived. Dkt. 62-1 at ¶ 9. He alleges that is because "by entering a small enclosed cell with two offenders who were fighting, he would have jeopardized his own safety along with the safety of other offenders and staff in the D unit." Dkt. 62-1 at ¶ 9. He also thought there could be a weapon present in the cell. Dkt. 62-1 at ¶ 10. Additionally, he states that, without opening the door (and endangering himself and other inmates), he could not spray a chemical agent (such as mace) into the cell as the door did not contain a cuff port. Dkt. 62-1 at ¶ 11. In the incident report form from February 20, 2016, Officer Vululleh stated that "he waited to open the door until backup arrived because when he saw the blood he thought there could be a weapon." Dkt. 70-1 at 2.

The next day, while Mr. Jones was in the medical unit, Officer Vululleh came by with a Conduct Report. Dkt. 62-2 at 31 (Jones Depo. at 37:19-25). Mr. Jones asked Officer Vululleh why he failed to help Mr. Jones. Dkt. 62-2 at 31, 33, 35, 53 (Jones Depo. at 37:19-20, 39:19-22, 41:7-10, 64:1-4). Officer Vululleh replied, "I didn't want to spray my guy." Dkt. 62-2 at 31, 33, 35, 53 (Jones Depo. at 37:21, 39:23-24, 41:7-10, 64:1-4). Mr. Jones asked him again something

5

to the effect of either "so you was going to let him kill me?" or why did Officer Vululleh fail to help by spraying mace. Dkt. 62-2 at 31, 35 (Jones Depo. at 37:22, 41:7-10). Officer Vululleh reiterated, "I just didn't want to spray my guy." Dkt. 62-2 at 31, 35 (Jones Depo. at 37:23, 41:7-10). Mr. Jones is confident that he was not the "my guy" referred to by Officer Vululleh, and that it referred to Outlaw. Dkt. 62-2 at 34 (Jones Depo. at 40:21-25); dkt. 68-1 at ¶ 1. Mr. Jones further states that afterwards, he heard that Officer Vululleh told others that Outlaw almost killed Mr. Jones. Dkt. 62-2 at 32, 53 (Jones Depo. at 38:3-7, 64:13-25).

### III. Discussion

Officer Vululleh moves for summary judgment on Mr. Jones's failure to protect claim. He argues that the undisputed facts do not establish that he acted with deliberate indifference to Mr. Jones's health and safety. Moreover, he asserts he is entitled to qualified immunity because, as of February 20, 2016, it was not clearly established that a correctional officer was required—after calling for assistance—to open a closed cell, without backup, in an attempt to break up a fight between offenders, when doing so would significantly jeopardize the officer's safety.

#### A. Failure to Protect

##### 1. *Standard for Failure to Protect*

Not every harm caused by another inmate translates into constitutional liability for the corrections officers responsible for the prisoner's safety. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). The Seventh Circuit has repeatedly held that deliberate indifference is not a strict liability standard requiring jail officials to ensure the safety of their inmates. *Palmer v. Marion County*, 327 F.3d 588, 593 (7th Cir. 2003).

Prison officials have a duty to protect those in their custody from violence at the hand of other inmates. But liability of a prison official for failure to protect an inmate only materializes if

6

the official 'knows of and disregards an excessive risk to inmate health or safety.'" *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (quoting *Farmer,* 511 U.S. at 837 (1994)). Thus, a claim that a prison official was deliberately indifferent to such a risk has both an objective and a subjective component. First, the harm to which the prisoner was exposed must be an objectively serious one. *See Gevas,* 798 F.3d 475 (being stabbed by cellmate constitutes serious harm); *Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2005) ("a beating suffered at the hands of a follow detainee ... clearly constitutes serious harm").

The subjective prong of the deliberate indifference claim "requires that the official must have actual, and not merely constructive, knowledge of the risk in order to be held liable; specifically, he 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference.'" *Gervas,* 798 F.3d at 481 (*quoting Farmer*, 511 U.S. at 837). In addition to knowing that the inmate faced a substantial risk of serious harm, an official will only be liable when he disregards that risk by failing to take reasonable measures to abate it. *Farmer*, 511 U.S. at 847; s*ee also Borello v. Allison*, 446 F.3d 742, 747 (7th Cir. 2006).

*2. Objective Prong of Deliberate Indifference Failure to Protect*

It is undisputed that the harm Mr. Jones suffered was an objectively serious one. Mr. Jones was stabbed and sliced in his face and neck repeatedly by a sharp object (either a knife or mirror shard) wielded by Outlaw. As a result of these wounds, he suffered blood loss and lacerations in his face and neck. *See* Dkt. 62-2 at 29-30, 38 (Jones Depo. at 35:23-36:17, 44:1-3, 44:15-20), dkt. 73:4 at 13 (Jones Depo. at 48:2-17), 68-1 at 7 (image of scarred face), 75-1 at 19 (image of scarred face).

### 3. *Subjective Prong of Deliberate Indifference Failure to Protect*

At issue is whether, under the subjective prong, Officer Vululleh acted with deliberate indifference. Officer Vululleh argues that he intervened with due regard for his own safety and the safety of other staff and offenders at the facility – that is, he asserts that he properly ordered Mr. Jones and Outlaw to stop fighting, called a "signal 10-10" over his radio, and waited to enter the cell until backup arrived so as not to jeopardize his own safety along with the safety of other offenders and staff in the D Unit. *See* dkt. 64 at 8-9. Officer Vululleh further asserts it would not have been reasonable to use pepper spray under these circumstances where he could not have sprayed anyone without opening the door, and opening the door would have endangered himself and the other individuals in the D Unit. *Id.* at 10.

The Seventh Circuit has consistently held that "[a] prison guard, acting alone, is not required to take the unreasonable risk of attempting to break up a fight between two inmates when the circumstances make it clear that such action would put her in significant jeopardy." *Guzman v. Sheahan*, 495 F.3d 852, 858 (7th Cir. 2007); *see also Peate v. McCann*, 294 F.3d 879, 883 (7th Cir. 2002) (failing to intervene between two inmates fighting with weapons is not deliberate indifference); *Shields v. Dart*, 664 F.3d 178, 181 (7th Cir. 2011) (noting that "correctional officers who are present during a violent altercation between prisoners are not deliberately indifferent if they intervene with a due regard for their safety . . . .").

While an officer is not deliberately indifferent for failing to immediately intervene, the officer must still promptly respond in a reasonable manner. *See Eddmonds v. Walker*, 317 F. App'x 556, 558 (7th Cir. 2009) (noting that "immediate intervention in an inmate-on-inmate assault is not necessary" and that the officers responded immediately to resolve the situation); *Guzman*, 495 F.3d 852, 858 (holding that an officer was not deliberately indifferent when she

8

immediately called for backup and left her post for three minutes after an inmate fight broke out, apparently in search of backup).

The evidence taken in the light most favorable to Mr. Jones shows that Officer Vululleh was present for the start of the fight (at least shortly before the throwing of the hot coffee) and held the door closed without taking any action until Mr. Jones had Outlaw pinned to the ground. Thus, Officer Vululleh watched as Outlaw and Mr. Jones were arguing loudly, watched Outlaw throw a cup of hot coffee at Mr. Jones's face, and watched Outlaw take out a knife or mirror shard, lunge at Mr. Jones and stab and slice Mr. Jones numerous times. With each progression of this fight, Officer Vululleh merely stood at the door, holding the door closed, and did not call for backup (as in *Guzman*, *Eddmonds* and *Shield*) or exercise authority by shouting verbal commands such as "knock it off" or "stop" (as in *Guzman* and *Shield*). It was not until Mr. Jones finally gained the upper hand and had Outlaw pinned to the ground that Officer Vululleh finally issued a verbal command to Outlaw to "get off him." At this point, Mr. Jones was bleeding profusely and had multiple gashes in his face and neck (with a knife stuck in his neck), while Outlaw had suffered no injuries. Again, based on the evidence taken in the light most favorable to Mr. Jones, Mr. Jones had to go to the door where Officer Vululleh was standing before Officer Vululleh finally called for backup, approximately 30-45 seconds after the fight had already ended.

It is true that Officer Vululleh was not required to intervene in the fight between Mr. Jones and Outlaw by opening the door, going into intervene, or attempting to spray pepper spray into a 2" gap at the bottom of the door. *See, e.g., Guzman*, 495 F.3d 852, 858. Officer Vululleh was, however, required to take reasonable measures to ensure Mr. Jones's safety, such as by calling for back up or using his authority to order the inmates to stop fighting.

9

There is no dispute that Officer Vululleh *eventually* called for backup and that backup showed up about a minute and a half after the coffee was first thrown in Mr. Jones's face. However, the evidence also shows that Officer Vululleh did not call for backup until after the fight was already over and Mr. Jones presented his bloody face to the door and begged for help and medical assistance. The evidence further shows that backup showed up promptly in about three seconds after backup assistance was requested.

There is also no dispute that Officer Vululleh *eventually* ordered the inmates to stop fighting. However, he failed to issue any verbal commands until after at least two separate previous instances where Mr. Jones asked for help, including when coffee was thrown in his face and when Outlaw drew out a knife (or mirror shard), and only when Mr. Jones, the victim, had already finally pinned Outlaw to the ground.

Thus, the evidence shows that, beginning with the throwing of the cup of hot coffee, Officer Vululleh knew "of and disregard[ed] an excessive risk to [Mr. Jones's] health or safety," *Farmer*, 511 U.S. at 837, but also actively participated in creating the risk of harm by keeping the door closed and not calling for backup or ordering that the fight stop until Mr. Jones had Outlaw pinned to the ground. A tried of fact could find that inaction by Officer Vululleh was failure to take reasonable measures to abate the risk to Mr. Jones. Thus, because there is a genuine dispute as to material facts in this case, summary judgment on Mr. Jones's failure to protect claim is not appropriate.

## B. Qualified Immunity

Officer Vululleh argues that even if the Court determines that Mr. Jones's Eighth Amendment right was violated, he is entitled to qualified immunity. "Qualified immunity protects officers performing discretionary functions from civil liability so long as their conduct does not

violate clearly established statutory or constitutional rights that a reasonable person would know about." *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015) (internal quotation omitted). Analysis of the qualified immunity defense requires a consideration of: (1) whether the plaintiff's constitutional rights were violated and (2) whether the right clearly established at the time. *Id.*

As explained above, based on the evidence taken in the light most favorable to Mr. Jones, a trier of fact could find that Officer Vululleh failed to protect Mr. Jones in violation of Eighth Amendment right.

Having concluded that a constitutional violation has been sufficiently alleged, the Court must examine the second qualified immunity element—that is, "whether the right at issue was clearly established at the time of the violation." *Rooni*, 742 F.3d at 742 (citation omitted). "To be clearly established at the time of the challenged conduct, the right's contours must be 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right,' and 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013) (quoting *Humphries v. Milwaukee Cnty.*, 702 F.3d 1003, 1006 (7th Cir. 2012)). That being said, "a case directly on point is not required for a right to be clearly established and 'officials can still be on notice that their conduct violates established law even in novel factual circumstances.'" *Abbott*, 705 F.3d at 731 (quoting *Phillips*, 678 F.3d at 528). Specifically, a plaintiff "must either (1) present case law that has articulated both the right at issue and applied it to a factual circumstance similar to the one at hand or (2) demonstrate that the contours of the right are so established as to make the unconstitutionality obvious." *Ault v. Speicher*, 634 F.3d 942, 946 (7th Cir. 2011).

Mr. Jones has not pointed to case law involving a similar factual scenario to the one presented here. But "a case directly on point is not required for a right to be clearly established."

*Abbott*, 705 F.3d at 731. Indeed, the Seventh Circuit held in *Gevas* that the defendants were not entitled to qualified immunity on the plaintiff's Eighth Amendment claim even though a factually similar case was not present because "[a] prison official could not logically believe, in view of the duty imposed on him by the Eighth Amendment, *Farmer*, and other deliberate indifference cases" that their conduct was constitutional. 798 F.3d at 485.

Although this case is factually distinct from *Gevas*, the same reasoning applies. *Farmer* and subsequent Eighth Amendment cases make clear that prison officials "have the duty to protect a prisoner once they become aware he is in danger of assault by another prisoner." *Id.* at 484. And *Guzman, Shield,* and *Eddmonds* hold that an officer must take prompt reasonable measures to ensure that inmates are not at risk – failure to do so would violate the Eighth Amendment. *See Guzman*, 495 F.3d at 858-59; *Shields*, 664 F.3d at 181-82; *Eddmonds*, 317 Fed. Appx. at 559. Officer Vululleh's failure to take any action, despite being aware of the danger faced by Mr. Jones, cannot be construed as a reasonable response to the situation. Between *Farmer*, *Guzman, Shields,* and *Eddmonds*, the "unconstitutionality" of Officer Vululleh's alleged conduct, or lack thereof, was "obvious." *Ault*, 634 F.3d at 946.

In sum, the qualified-immunity inquiry asks "whether it would have been clear to a reasonable officer that the alleged conduct was unlawful in the situation he confronted." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017). It would certainly have been clear to a reasonable correctional officer in Officer Vululleh's position that watching a fight unfold and keeping the door closed without taking any action (such as calling for backup or ordering the fight to stop) is unlawful. Accordingly, Officer Vululleh is not entitled to qualified immunity on Mr. Jones's Eighth Amendment claim.

## IV. CONCLUSION

For the reasons explained, Defendant Officer Vululleh's motion for summary judgment, dkt. [61], is **denied.** Mr. Jones's claim against Officer Vululleh shall proceed in this action. Because this action will be resolved by settlement or trial, the Magistrate Judge is requested to set this matter for a telephonic status conference to discuss what further development is necessary for trial and if the case is amenable to settlement.

**IT IS SO ORDERED.**

Date: 3/12/2018

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

ANTOINE JONES
129759
PENDLETON - CIF
CORRECTIONAL INDUSTRIAL FACILITY
Electronic Service Participant – Court Only

David C. Dickmeyer
INDIANA ATTORNEY GENERAL
David.Dickmeyer@atg.in.gov

Benjamin Myron Lane Jones
INDIANA ATTORNEY GENERAL
benjamin.jones@atg.in.gov

Jonathan Lamont Mayes
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
jmayes@boselaw.com

The Honorable Magistrate Judge Matthew P. Brookman